Bernard BOLENDER, a/k/a Bernard Bolander, Petitioner–Appellant,

v.

Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent–Appellee.

No. 91–5254.

United States Court of Appeals, Eleventh Circuit.

March 11, 1994.

Billy H. Nolas, Julie D. Naylor, Ocala, FL, for petitioner-appellant.

Fariba Komeily, Asst. Atty. Gen., Miami, FL, for respondent-appellee.

Before TJOFLAT, Chief Judge, COX and DUBINA, Circuit Judges.

TJOFLAT, Chief Judge:

Bernard Bolender is a Florida prison inmate. In 1980, a jury convicted him of four counts of first degree murder, four counts of kidnapping, and four counts of armed robbery for torturing and slaying four alleged drug dealers. The jury unanimously recommended a sentence of life imprisonment for each murder, but the trial court overrode that recommendation and sentenced Bolender to death for the murder convictions and to consecutive life sentences for the other crimes. After exhausting direct appeals and state collateral attacks, Bolender filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 2254 (1988), seeking the vacation of both his convictions and his death sentences.

In his habeas petition, Bolender mounted seventeen challenges to his convictions and death sentences; the district court denied relief without holding an evidentiary hearing. Bolender appeals the district court's disposition of five of his claims as well as its refusal to conduct an evidentiary hearing on the merits of his contentions. We hold that the

district court properly declined to issue the writ. Accordingly, we affirm.

## I.

### A.

The facts leading to Bolender's convictions and death sentences are well documented in the voluminous record of this murder case and can be briefly summarized as follows.[1] On the evening of January 7, 1980, Bolender and two codefendants, Paul Thompson and Joseph Macker, were at Macker's residence in Dade County, Florida, when two of the victims, John Merino and Rudy Ayan, arrived to participate in a drug deal.[2] A dispute erupted shortly thereafter, apparently concerning the whereabouts of the narcotics that were to be purchased in the contemplated transaction. Bolender, who was armed with a gun, ordered Merino and Ayan to strip down to their shorts and lie down on the floor in one of the bedrooms.

The defendants brought the final two victims into the house shortly after the conflict began. At one point, Thompson went outside and returned holding Scott Bennett, whom he had discovered hiding in the bushes around the house, at gunpoint. After searching Bennett, Thompson confiscated one kilogram of cocaine and two guns. Macker then took his gun and went outside to see if anyone else was lurking in the vicinity. He noticed an unfamiliar blue car driving back and forth in front of the house. Macker motioned for the driver to come inside, but the driver refused. Thompson then ordered Merino to get dressed, and the two men succeeded in luring the driver, Nicomedes

1. The ensuing discussion draws upon the facts as established by the Florida Supreme Court on direct appeal, *Bolender v. State*, 422 So.2d 833 (Fla.1982) (*"Bolender I"*), *cert. denied*, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983). Under 28 U.S.C. § 2254(d) (1988), a federal court reviewing a petition for a writ of habeas corpus filed by a state prisoner must give a presumption of correctness to factual determinations made by state courts (once certain prerequisites are met). *See Cumbie v. Singletary*, 991 F.2d 715, 723 (11th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993); *Lusk v. Dugger*, 890 F.2d 332, 336 (11th Cir. 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 805 (1990). This presump-

tion is equally applicable to state appellate court findings of fact. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

2. Trial testimony revealed that several additional people were in other parts of the house that night but were neither victims of the crimes nor direct participants in the ensuing criminal activity. They included Macker's pregnant wife, two friends of the Mackers, two unnamed women referred to as prostitutes, and Macker's bodyguard (or "houseman") who had lived there for approximately three years. All of these people were aware of the violence as it occurred, but they stayed out of the way.

Hernandez, into the house. The defendants ordered Bennett, Hernandez, and Merino to strip and to join Ayan on the floor; they then robbed all four victims of their jewelry. Thompson also searched Hernandez' car and discovered approximately $3,000 in cash along with two more guns.

Macker testified that the fate of the four victims was essentially sealed by this point. Indeed, Thompson made clear to Macker when he was outside the house that the men then being held by Bolender in the bedroom could never be allowed to leave. Meanwhile, Bolender was becoming increasingly agitated, threatening to kill all four men if they did not reveal the location of an additional twenty kilograms of cocaine that he believed the four men were concealing. The victims insisted that they had only the one kilogram Bennett was carrying, but Bolender refused to believe them. Thus began the brutal series of events that culminated in the quadruple murder. As the Florida Supreme Court found, "during the ensuing hours the victims were tortured and terrorized in an attempt to obtain their cocaine." *Bolender v. State*, 422 So.2d 833, 834 (Fla.1982) ("*Bolender I*"), *cert. denied*, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983).

Macker testified that Bolender, assisted by Thompson, taped the victims' hands and feet with duct tape. Bolender then repeatedly beat the four men with a baseball bat in an attempt to get them to talk. Hernandez was singled out for special attention: Bolender used a hot butcher knife to burn his back and later shot him in the leg. The victims continued to insist, however, that they had only one kilogram of cocaine, not the twenty that Bolender wanted; they pleaded with Bolender to listen to them. Macker admitted hitting Merino once with the baseball bat, but claimed that he did so only out of fear that Bolender and Thompson would turn on him if he did not demonstrate solidarity with them. Macker denied any further involvement in the actual killings and stressed that Bolender had dominated him and Thompson throughout the entire enterprise.

The defendants then gagged the victims and wrapped them in sheets, bedspreads, rugs, and the material from a beanbag chair.

Bolender continued to beat and stab the four men savagely, even as they were being moved through the house and taken outside to the car Hernandez had been driving. According to Macker, all of the victims were alive when they were wrapped; by the time the bodies were loaded into the car, however, only Merino appeared to be breathing. Bolender and Thompson placed Bennett and Ayan in the trunk of the car, Merino in the back seat, and Hernandez in the front.

At approximately 4:30 a.m. on January 8, Bolender and Thompson left Macker's residence in two cars, with the bodies of the victims in Hernandez' vehicle. They drove onto the I–95 expressway and parked the car with the bodies on the side of the highway a short distance past the entrance ramp. Intending to destroy the evidence of the crime by burning the car and the victims, they poured gasoline on the vehicle and the surrounding grass and set the grass on fire as they left. The car failed to burn, however, because passing motorists saw the fire and put it out before the vehicle was consumed. Bolender and Thompson returned to Macker's house in the other vehicle.

Later that morning, the defendants thoroughly cleaned Macker's home, removing bloodied carpeting and other evidence of the murders. Macker disposed of the weapons used in the killings, as well as the guns taken from the victims, in a nearby canal. Nevertheless, because the attempt to destroy the car and the bodies had failed, the authorities were able to link Bolender and Macker to the crimes. Bolender's fingerprints were found on the car, and several of the sheets and rugs found wrapped around the bodies were identified as having come from the Macker home. Based upon this evidence and a search of the Macker residence, Bolender and Macker were arrested for the murders on January 13, 1980. Macker gave a statement to the authorities on January 18 in which he implicated himself, Bolender, and Thompson in the murders; he also revealed where he had disposed of the evidence.

### B.

The state charged Bolender, Macker, and Thompson with four counts each of first de-

gree murder, kidnapping, and armed robbery. Macker pled guilty to reduced charges of second degree murder for the four homicides and became a witness for the state, and Thompson was adjudicated incompetent to stand trial.[3] Thus, Bolender was tried alone. In exchange for his cooperation with the prosecution, Macker received concurrent life sentences on all twelve counts, plus an additional fifteen-year term in prison for possession of cocaine.

At trial in April, 1980, Bolender raised an alibi defense, contending that he was at home in Fort Lauderdale with his girlfriend, Dawn Poulis, and Merino's wife, Claudia, at the time of the murders. Merino and his wife had been living in Bolender's house since December 24, 1979. Both Claudia Merino and Poulis testified that Bolender was at home with them during the early morning hours of January 8, 1980. The jury, however, rejected Bolender's alibi claims and convicted him on all counts.

Neither the state nor Bolender presented any evidence at the penalty phase of the murder prosecutions, which was held immediately following the return of the verdicts.

After hearing the arguments of counsel, the jury deliberated only twelve minutes before unanimously recommending a sentence of life imprisonment. Defense counsel then declined to present additional evidence after being offered an opportunity to do so before the trial judge. Neither party objected to the immediate imposition of sentence, so the judge overrode the jury's recommendation and imposed the death penalty after finding eight of the nine statutory aggravating factors then on the books to apply;[4] the judge found no evidence in mitigation.[5]

Thereafter, Bolender pursued numerous direct and collateral challenges to his convictions and death sentences. On direct appeal, the Florida Supreme Court affirmed Bolender's convictions and sentences.[6] *Bolender I*, 422 So.2d at 838. Bolender then moved the trial court for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, alleging ineffective assistance of counsel at both the guilt and penalty phases of the trial.[7] After the Governor signed a death warrant, the trial court held an evidentiary hearing in January, 1985, and vacated Bolender's death sentences on the ground

---

**3.** On January 25, 1990, after being found competent to stand trial, Thompson pled guilty to four counts of second degree murder for his role in the crimes at issue here, thereby avoiding the death penalty.

**4.** The court found the following aggravating circumstances present, as enumerated in Fla.Stat. Ann. § 921.141(5) (West 1985): the capital felony was committed (1) by a person under sentence of imprisonment; (2) by a defendant who knowingly created a great risk of death to many persons; (3) during the perpetration of a robbery/kidnapping; (4) for pecuniary gain; (5) for the purpose of avoiding or preventing a lawful arrest; (6) to disrupt or hinder the lawful exercise of law enforcement; (7) in an especially heinous, atrocious, or cruel manner; and (8) in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The ninth aggravating factor was not present in this case, the court found, because the defendant had not previously been convicted of another capital felony or of a felony involving the use or threat of violence to the person. It should be noted that two additional aggravating circumstances were later added to the statute. *See* Fla.Stat.Ann. § 921.141(5) (West Supp.1993).

**5.** The judge placed findings in the record at the time he imposed sentence from the bench; as

required by statute, written findings of fact and conclusions of law in support of the death sentence were later entered by the court on May 7, 1980.

**6.** On direct appeal, Bolender raised issues regarding the trial court's alleged abuses of discretion in refusing to permit a defense witness to be recalled essentially to repeat her testimony through an interpreter, in overriding the jury's recommendation of life, and in considering improper aggravating circumstances. The Florida Supreme Court concluded that the court had erred in applying two of the aggravating circumstances outlined *supra*, note 4: the first, because "being on probation is not equivalent to being under a sentence of imprisonment at the time of the crime," and the second, because Bolender never directed his actions toward any of the uninvolved people in the house that night. *Bolender I*, 422 So.2d at 837–38. The court affirmed the application of the remaining factors, however, and concluded that, given the lack of mitigating evidence, the disapproval of two aggravating circumstances did not require reversal of the death sentence. *Id.* at 838.

**7.** Because the judge who tried Bolender's case had since retired from the bench, these proceedings were conducted before a different judge of the same Florida circuit court.

that trial counsel was ineffective for failing to present mitigating evidence at the sentencing hearing, despite what the court acknowledged to be the attorney's strategic decision to rely exclusively on a quick life recommendation from the jury. The state appealed the order vacating the death sentences, and the Florida Supreme Court reversed and directed that Bolender's sentences be reinstated. *State v. Bolender*, 503 So.2d 1247 (Fla.1987) ("*Bolender II* ") (finding that the mitigating evidence presented during evidentiary hearing was known and available to counsel at time of sentencing, but that counsel made a tactical decision not to present such evidence), *cert. denied*, 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 161 (1987).

In April of 1989, after the trial court had reinstated his death sentences, Bolender filed a second motion for postconviction relief under Rule 3.850. The Governor signed a second death warrant in January, 1990, and execution was scheduled for March 7 of that year. Following oral argument, the trial court found Bolender's motion to be a successive Rule 3.850 petition and denied relief without holding an evidentiary hearing. Bolender appealed this judgment and, on March 5, 1990, filed an application for a stay of execution and a petition for writ of habeas corpus in the Florida Supreme Court. The stay was granted in order to allow the trial court to hear additional arguments. After the court again denied relief, the Florida Supreme Court heard oral argument and denied relief as to all pending claims. *Bolender v. Dugger*, 564 So.2d 1057 (Fla.1990) ("*Bolender III* ").[8] The Governor then signed a third death warrant, and Bolender's execution was scheduled for October 4, 1990.

■ At this point, Bolender entered the federal system by filing the instant petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida on October 1, 1990. The district court granted a stay of execution and held two days of non-evidentiary hearings to address the matters presented by Bolender's petition. The district court then denied Bolender's requests for an evidentiary hearing and denied relief. *Bolender v. Dugger*, 757 F.Supp. 1400 (S.D.Fla.1991). The court did grant a certificate of probable cause to appeal, however, and this appeal ensued. Bolender appeals the denial of the writ of habeas corpus as to five of his claims as well as the district court's refusal to conduct an evidentiary hearing.[9]

Ordinarily, we discuss claims on appeal relating to a criminal defendant's conviction before evaluating possible sentencing errors. In this case, however, we find no merit to

---

**8.** The court found that all but one of the issues raised on the Rule 3.850 appeal were procedurally barred, in that they could or should have been raised on direct appeal or in the first postconviction relief proceeding. *Bolender III*, 564 So.2d at 1058. The court considered, and rejected on the merits, Bolender's claim that the trial court had refused to consider, and that trial counsel had felt constrained in developing and presenting, nonstatutory mitigating evidence in violation of *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). *Id.* In addition, the court declined to consider the claims raised in Bolender's habeas corpus petition, including claims of ineffective assistance of counsel, because the court had "fully considered the propriety of Bolender's sentences on direct appeal" and "[h]abeas corpus is not to be used to relitigate issues determined in a prior appeal." *Id.* at 1059.

**9.** The district court properly denied Bolender's request for an evidentiary hearing. As we have recently noted, "[i]t is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief." *Meeks v. Singletary*, 963 F.2d 316, 319 (11th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993). An evidentiary hearing is not necessary, however, where the state courts have made findings of fact relevant to the claims at issue; those findings are, of course, entitled to a presumption of correctness. *Id.* In addition, no evidentiary hearing is necessary where the proffered evidence would not affect the resolution of the claim. *See Stephens v. Kemp*, 846 F.2d 642 (11th Cir.) (no evidentiary hearing necessary on ineffective assistance claim where evidence petitioner sought to introduce would not affect resolution of issue), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

As we explain during the course of our discussion of Bolender's substantive claims, the state courts have made the findings of fact necessary to decide most of the issues raised in this appeal. On the other claims, an evidentiary hearing would not aid in the resolution of the issues. Accordingly, Bolender is not entitled to a federal evidentiary hearing.

Bolender's guilt phase claims. Accordingly, we begin our discussion with his more significant allegations, all of which concern the penalty phase of his capital trial. In part II, we address Bolender's claims of ineffective assistance of counsel at sentencing. In part III, we examine the related contentions that Bolender's attorney felt constrained in developing and presenting nonstatutory mitigating evidence at the penalty phase, and that the sentencing judge (and, on appeal, the Supreme Court of Florida) failed meaningfully to consider nonstatutory mitigation. Part IV concerns the alleged constitutional deficiencies in the Florida Supreme Court's review of this case. Then, in parts V and VI, we consider two alleged errors at the guilt phase of Bolender's trial: a denial of his right to compulsory process and an improper jury instruction.

## II.

■ Bolender contends on appeal that he was denied reasonably effective assistance of counsel during the penalty phase of his trial because his lawyer did not present evidence of his troubled background as a nonstatutory mitigating circumstance.[10] Florida law provides for separate guilt and penalty stages in capital cases. After a defendant is convicted of a capital offense, the jury hears additional evidence and recommends to the trial court a sentence of life imprisonment or, if it finds that sufficient aggravating circumstances (as enumerated in the death penalty statute) exist to outweigh the mitigating factors proved, death. Neither jury recommendation is binding upon the trial court, which conducts its own sentencing hearing and ultimately fixes the sentence after weighing the aggravating and mitigating circumstances. *See* Fla.Stat.Ann. § 921.141(1)–(3) (West 1985); *Cooper v. Wainwright,* 807 F.2d 881, 883 n. 2 (11th Cir.1986) (describing procedure for imposing death penalty in Florida), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987).

■ The familiar standard enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs claims that a defendant has been denied the effective assistance of counsel guaranteed by the Sixth Amendment. In order to obtain the reversal of a conviction or a death sentence on such grounds, a defendant must show both (1) that the identified acts or omissions of counsel were deficient, or outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable

---

**10.** Bolender devotes a significant portion of his appellate brief to a discussion of the nonstatutory mitigating evidence that his counsel could have presented at the penalty phase. The proffered evidence included testimony from Bolender's family concerning his troubled background and drug abuse, evidence of assistance rendered to law enforcement officials and of good behavior while incarcerated, and testimony concerning alleged psychological difficulties resulting from a gunshot wound to the head several years before the 1980 offenses and severe drug abuse.

We need only consider the evidence of Bolender's family background that was presented at the state court evidentiary hearing on Bolender's first motion for postconviction relief. The other claims of ineffective assistance, flowing from counsel's failure to introduce the additional mitigating evidence at the penalty phase, were presented for the first time in the second motion for postconviction relief and were held to be procedurally barred by the Florida Supreme Court. *Bolender III,* 564 So.2d at 1058 n. 1.

A state court's rejection of a federal constitutional claim on procedural grounds will bar consideration of that claim by a federal habeas court if the state court's ruling rests on an independent and adequate state law ground (absent certain limited exceptions). *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Johnson v. Singletary,* 938 F.2d 1166, 1173 (11th Cir.1991) (en banc), *cert. denied,* — U.S. ——, 113 S.Ct. 361, 121 L.Ed.2d 274 (1992). The procedural default doctrine requires federal courts to show deference for state procedural rules. Claims raised improperly in the state postconviction review process may be barred, *Presnell v. Kemp,* 835 F.2d 1567, 1580 (11th Cir.1988), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989), and this court has specifically held that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law, *Whiddon v. Dugger,* 894 F.2d 1266 (11th Cir.), *cert. denied,* 498 U.S. 834, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990). Accordingly, the district court appropriately addressed Bolender's ineffective assistance of counsel claim by considering only those allegations that relate to the potentially mitigating testimony that Bolender's mother and sister could have provided. We do likewise. *See Footman v. Singletary,* 978 F.2d 1207, 1211 (11th Cir.1992).

probability that the balance of aggravating and mitigating circumstances would have been different. *Id.* at 687, 104 S.Ct. at 2064. We begin with a discussion of the first requirement.

### A.

■ The performance prong of the *Strickland* standard requires that defense counsel provide "reasonably effective assistance," *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, or simply representation that evinces "reasonableness under prevailing professional norms," *id.* at 688, 104 S.Ct. at 2065. It is important to note that judicial scrutiny of an attorney's performance is appropriately highly deferential because the craft of trying cases is far from an exact science; in fact, it is replete with uncertainties and obligatory judgment calls. Indeed, a reviewing court must avoid the "distorting effects of hindsight" by viewing the performance as it appeared to counsel at the time, *id.* at 689, 104 S.Ct. at 2065, and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id. See also Elledge v. Dugger,* 823 F.2d 1439, 1442–43 (11th Cir. 1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988). As we have explained, "[i]n practice this means that courts will not find that an attorney is incompetent for using a particular approach to a case so long as that approach was reasonable." *Harich v. Dugger,* 844 F.2d 1464, 1469 (11th Cir.1988), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). That is, "a court should be highly deferential to those choices ... that are arguably dictated by a reasonable trial strategy." *Devier v. Zant,* 3 F.3d 1445, 1450 (11th Cir.1993).

■ The failure to conduct a reasonable investigation into possible mitigating cir-

cumstances may render counsel's assistance ineffective. *Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). A defense attorney is not required to investigate all leads,[11] however, and "there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case." *Devier,* 3 F.3d at 1453. Indeed, "[c]ounsel has no absolute duty to present mitigating character evidence" at all, *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985), and "trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel," *Stevens v. Zant,* 968 F.2d 1076, 1082 (11th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993). As we have explained:

> In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is "virtually unchallengeable."

*Lightbourne,* 829 F.2d at 1025 (citations omitted); *see also Stevens,* 968 F.2d at 1082–83.

Thus, "a determination must be made whether the failure to put this [mitigating] evidence before the jury was a *tactical choice* by trial counsel. If so, such a choice must be given a strong presumption of correctness,

---

11. Under some circumstances, an attorney may make a strategic decision not to pursue a particular line of investigation, or to pursue a particular inquiry only so far, *see Rogers v. Zant,* 13 F.3d 384, 387 (11th Cir.1994), but the decision not to investigate a particular defense issue must be reasonable. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066; *Armstrong v. Dugger,* 833 F.2d 1430, 1432–33 (11th Cir.1987). An "attorney's decision not to investigate must not be evaluated with the benefit of hindsight but accorded a

strong presumption of reasonableness." *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987). The Supreme Court has outlined the general standard: "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066.

and the inquiry is generally at an end." *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1994). The only question then remaining would be whether Bolender's attorney had a reasonable basis for his strategic decision that an explication of the defendant's family background would not have reduced the risk of the death penalty. *Devier,* 3 F.3d at 1453. Nonetheless, it is important to note that "the mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances." *Stevens,* 968 F.2d at 1083.

■■■■ A thorough review of the record in this case demonstrates that trial counsel's decision regarding what evidence to present at the penalty phase of Bolender's trial was a reasonable, strategic choice.[12] Initially, as part of his investigation into possible mitigating circumstances, Bolender's counsel interviewed relatives concerning Bolender's family background. Indeed, a review of the state court evidentiary hearing transcript reveals that trial counsel was aware of Bolender's background in general, and of the availability of his mother and sister to testify in particular.[13] The Florida Supreme Court made such a finding of historic fact, *see Bolender II,* 503 So.2d at 1249, which we presume to be correct. This case is therefore distinguishable from those in which we have found a complete lack of investigation into a defendant's background to be unreasonable. *See, e.g., Blanco v. Singletary,* 943 F.2d 1477, 1501–02 (11th Cir.1991), *cert. denied,* ——

U.S. ——, 112 S.Ct. 2282, 119 L.Ed.2d 207, and *cert. denied,* —— U.S. ——, 112 S.Ct. 2290, 119 L.Ed.2d 213 (1992); *Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

In addition, trial counsel employed the results of his investigation in the manner best calculated in his judgment to achieve the result he tactically sought: a quick, unanimous recommendation of life imprisonment from the advisory jury. Indeed, the jury deliberated only twelve minutes before recommending incarceration for life as Bolender's sentence. After reviewing the available evidence in mitigation, Bolender's attorney elected not to introduce further testimony at the penalty phase of the trial; instead, he decided simply to argue that Bolender should be treated no more harshly than his codefendants, one of whom had been found incompetent to stand trial while another had received sentences of life imprisonment as a result of a plea agreement with the Government. That counsel's strategic decision "was effective to some degree is evidenced by the jury recommendation that Bolender be sentenced to life imprisonment." *Bolender II,* 503 So.2d at 1248–49.

According to the testimony of Bolender's trial counsel, his strategy was based upon several factors. First, Bolender himself had taken the stand during the guilt phase of the trial and had described some aspects of his background and employment history; counsel elected to rely on that testimony to personalize the defendant.[14] Second, counsel

---

12. Ineffectiveness of representation is a mixed question of law and fact subject to de novo review. Accordingly, "in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. Of course, state court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, and similar federal district court findings are deemed correct under Fed.R.Civ.P. 52(a) unless clearly erroneous. *See Bush v. Singletary,* 988 F.2d 1082, 1089 (11th Cir.1993). The question of whether a decision by counsel was a tactical one is a question of fact. *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.

1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992).

13. Bolender's mother testified at the Rule 3.850 evidentiary hearing that she had discussed Bolender's background with his attorney, who thus "knew it all" when he decided against putting her on the stand. The defendant's sister testified that she too had discussed these background issues with counsel before trial, in his office. Both reported that they were present in the courtroom and ready to testify during the penalty phase of the trial.

14. In fact, "[t]his court has specifically ruled that counsel's decision to rely on the defendant's testimony rather than offering the testimony of the defendant's family members to show a 'turbulent

was concerned that much of Bolender's background might, in fact, be viewed as aggravating rather than mitigating.[15] Third, Bolender's attorney was aware of a "scouting report" on the trial judge that suggested that he was unsympathetic to generic character pleas and generally favored the death penalty. Finally, and perhaps most important, Bolender's counsel wanted to get the jury deliberating on its sentence recommendation as soon as possible because, as he explained at the Rule 3.850 hearing, "after the guilt phase of the trial when they came out several jurors were teary-eyed when they read the verdict of guilty."

Based upon these calculations, Bolender's trial counsel elected to argue only the disparate and arbitrary treatment of Bolender to the jury. As the Florida Supreme Court found:

> [Bolender's counsel] stated that he knew the mother and sister were willing to testify, but that, after checking on the trial judge's reputation, he concluded that such nebulous nonstatutory mitigating evidence would have had little effect on the judge. Therefore, he made the tactical decision that a proportionality argument would be the better strategy.

*Bolender II*, 503 So.2d at 1249. Moreover, the same calculus explains why Bolender's attorney did not present additional mitigating circumstances to the judge after the jury's life recommendation; given the nature of the potential testimony and information about the judge's predilections, he believed that it would have done more harm than good. Instead, trial counsel attempted to capitalize on the jury's swift and unanimous recommendation because he believed that it would make the greatest impression on the court. *See Bolender II*, 503 So.2d at 1250. As the district court concluded:

> Counsel made the additional tactical decision to rely on the jury's recommendation and the disparity argument with the sentencing judge. Such decisions did not render counsel deficient since they were made deliberately, as part of a reasonable strategy after full investigation.

*Bolender*, 757 F.Supp. at 1407. Contrary to Bolender's contention, trial counsel was not idle or paralyzed into inaction. Under all the circumstances, both with respect to the penalty recommendation phase before the jury and the sentencing phase before the judge, we cannot conclude that the district court was clearly erroneous in finding that counsel made an informed and reasonable tactical decision to exclude the mitigating evidence of Bolender's background. *See Porter*, 14 F.3d at 559.

In numerous cases, this court has held that similar strategic decisions not to introduce mitigating evidence at the penalty phase of a capital punishment trial did not constitute constitutionally deficient assistance of counsel.[16] In *Francis v. Dugger*, 908 F.2d 696

family history' may be a reasonable strategic choice under the circumstances." *Lightbourne*, 829 F.2d at 1025–26; *see also Burger v. Kemp*, 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (rejecting ineffective assistance of counsel claim based on similar facts).

**15.** *See, e.g., Lusk*, 890 F.2d at 338 (explaining that, given the ability of the prosecution to cross-examine background witnesses, "such evidence might, in fact, be aggravating rather than mitigating" under some circumstances).

**16.** Bolender argues that previous decisions by this court in which the failure to investigate and introduce background evidence at the penalty phase of a capital trial was held to be prejudicial mandate the same holding in this case. We find those cases factually distinguishable because Bolender's counsel did in fact conduct an investigation. *See, e.g., Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.1989) (finding constitutional violation where "counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect"), *cert. denied*, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Porter v. Wainwright*, 805 F.2d 930 (11th Cir.1986), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987).

Furthermore, a survey of those decisions finding counsel's actions or omissions to be unreasonable indicate a level of incompetence far greater than that exhibited in this case. *See, e.g., Horton*, 941 F.2d at 1462 (concluding that counsel "began to follow one path, based upon a misinterpretation of the law, without ever evaluating the merits of alternative paths" when attorneys admitted during state habeas corpus evidentiary hearing that they never investigated any mitigating circumstances); *Armstrong*, 833 F.2d at 1433 (concluding that failure to present background evidence was not strategic when trial counsel's testimony at evidentiary hearing revealed negligible preparation and investigation for penalty phase); *Magill v. Dugger*, 824 F.2d

(11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991), for example, we rejected a habeas petitioner's argument that his counsel had rendered ineffective assistance during the penalty phase of the trial. Trial counsel had "made a decision to deliver a highly impassioned, emotional argument which, rather than focusing on Francis, emphasized the Easter season, forgiveness, compassion, and the value of life." *Id.* at 703. The court concluded:

> We cannot say that this strategy was unreasonable given counsel's reasoned belief ... that the trial judge would follow a life recommendation. As did the district court and the Florida Supreme Court, we find it significant that Francis' trial counsel obtained a life recommendation from the jury, following brief deliberations, where two prior juries had recommended death....

*Id. See also Porter,* 14 F.3d at 558 (explaining that counsel omitted presentation of family background to shield jury from defendant's prior criminal activity); *Stevens,* 968 F.2d at 1083–84 (noting that counsel's decision was reasonable given fear "that presenting mitigating evidence would backfire and reinforce any negative jury perceptions regarding Stevens' intent or relative culpability"); *Tafero v. Dugger,* 873 F.2d 249, 251 (11th Cir.1989) (defense counsel's actions in not introducing mitigating circumstances did not constitute ineffective assistance because they resulted from deliberation and tactical choices), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1834, 108 L.Ed.2d 962 (1990). Bolender's counsel made a similar decision, electing to plead for mercy and to argue the dubious equity of sentencing one codefendant to death while allowing the state to select another codefendant for life imprisonment through a plea agreement.

It is elementary that, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064. The record in this case reflects that counsel's performance, despite the outcome, was not outside the wide range of professionally competent assistance. Perhaps other reasonable lawyers trying this case would have chosen to introduce the background evidence in mitigation, but Bolender's lawyer was not constitutionally ineffective for making the professional judgment to rely on the disparate treatment argument instead. A court reviewing ineffectiveness claims must "address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984).

### B.

 Furthermore, even if we were to hold that trial counsel rendered ineffective assistance by not introducing the mitigating evidence Bolender urges, we nonetheless would still affirm. Bolender has not satisfied the prejudice requirement of *Strickland,* namely that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[17] 466 U.S. at 694, 104 S.Ct. at 2068. When challenging the imposition of the death penalty, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently

---

879 (11th Cir.1987) (holding that performance of counsel whose first involvement with the case came on the morning of trial constituted ineffective assistance); *Elledge,* 823 F.2d at 1445 (holding that "counsel's total failure to investigate possible witnesses, both expert and lay, when he was aware of Elledge's past and knew that mitigation was his client's sole defense, was unprofessional performance").

Here, by contrast, counsel investigated possible sources of mitigating evidence, weighed the efficacy of presenting that evidence, and made a reasonable tactical decision not to present that testimony. Given that this strategy had succeed-ed with the jury, it was not unreasonable for counsel to pursue the same approach with a trial judge known to respond unfavorably to general character evidence.

17. Like the performance prong, the prejudice component of the inquiry presents a mixed question of law and fact for our review. A court deciding an ineffective assistance claim may elect to address either the performance or the prejudice prong first. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069; *see also Messer v. Kemp,* 760 F.2d 1080, 1088 (11th Cir.1985), *cert. denied,* 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986).

Bolender's argument on this point is predicated upon a misunderstanding of Florida override law. The Florida jury override standard enunciated in *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975), states that "to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." As alternatively formulated, an advisory jury's life recommendation "should not be overruled unless no reasonable basis exists for the opinion." *Richardson v. State,* 437 So.2d 1091, 1095 (Fla.1983).

Bolender repeatedly contends that had *any* mitigating evidence been introduced at the penalty phase, either before the jury or before the court at sentencing, then the trial court would not have been entitled to override the advisory jury's life recommendation. In granting relief during Bolender's first Rule 3.850 proceeding, the trial court based its decision upon the same argument: "[t]he law of the State of Florida is that a death sentence may not be imposed when any evidence of mitigating circumstances is presented." The Florida Supreme Court reversed, however, explaining the trial court's error:

> That the mere presentation of mitigating evidence precludes imposition of the death penalty is not and never has been a correct statement of this state's law. In determining if death is an appropriate penalty the sentencing judge must weigh any aggravating circumstances against any mitigating circumstances.

*Bolender II,* 503 So.2d at 1249. We have also rejected Bolender's contention when dealing with habeas corpus petitions from Florida death row inmates, "abjur[ing] any implication therein that the existence of any mitigating evidence in the record, whether statutory or not, means that a trial judge cannot constitutionally override a jury recommendation of life." *Lusk v. Dugger,* 890 F.2d 332, 341 n. 8 (11th Cir.1989). It is well established that, contrary to Bolender's position, "the mere presence of mitigating evidence does not automatically provide a reasonable basis for the jury's recommendation." *Francis,* 908 F.2d at 704.

As noted above, the proper inquiry when a defendant challenges the propriety of a death sentence is whether, absent counsel's allegedly inadequate performance, a reasonable probability exists that the balance of aggravating and mitigating circumstances did not warrant death. We agree with the district court's conclusion that the prejudice component of the *Strickland* standard was not met in this case. *See Bolender,* 757 F.Supp. at 1408 (holding that the proffered changes in strategy would not have altered trial court's judgment). The Florida Supreme Court upheld the trial court's findings on all but two of the aggravating circumstances. Given the details of this case, including among other things the fact that Bolender was twenty-seven years old at the time of the murders, "evidence of a deprived and abusive childhood is entitled to little, if any mitigating weight" when compared to the aggravating factors. *Francis,* 908 F.2d at 703. Indeed, "we find that any mitigating effect does not begin to tip the balance of aggravating and mitigating factors in favor of [a] petitioner" who has "simply failed to show that counsel's performance was so deficient during the sentencing phase that this court cannot rely on the result as being just." *Lightbourne,* 829 F.2d at 1026. We now turn to Bolender's related claims concerning the presentation and consideration of nonstatutory mitigating circumstances during the penalty phase of his trial.

## III.

In a series of cases, the Supreme Court has held that the Eighth Amendment, as applied to the states through the Fourteenth Amendment, requires that a sentencer in a capital case not be prevented from considering any aspect of a defendant's character or record as a mitigating circumstance. *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S.

586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion).[18] Hence, while a state may list mitigating factors to be considered in its death penalty statute, as Florida does, it may not restrict the defendant to arguing only those statutory circumstances.[19] In *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), the Court held that, under the Florida procedure for trying capital cases, an advisory jury may not be prohibited from considering relevant nonstatutory mitigating circumstances in making its sentencing recommendation, and that the judge must consider such mitigating evidence in determining an appropriate sentence. Accordingly, a *Hitchcock* violation is based upon a *Lockett* violation, and "*Hitchcock* has breathed new vitality into claims based on the exclusion of non-statutory mitigating factors" from the sentencing process in Florida capital cases. *Hargrave v. Dugger*, 832 F.2d 1528, 1533 (11th Cir.1987), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989).

▪ In light of these cases, Bolender alleges two errors relating to the deficient consideration of nonstatutory mitigating evidence during the penalty phase of his trial.[20] First, Bolender claims that his counsel felt constrained in developing and presenting such nonstatutory mitigating evidence at the sentencing hearing.[21] Second, he contends that the sentencing judge and the Supreme Court of Florida both failed meaningfully to consider nonstatutory mitigation. These distinct, albeit related, claims were often confused during the argument of this case. We consider each in turn.

### A.

Bolender contends that his counsel at trial was constrained in presenting nonstatutory mitigating evidence in violation of *Lockett*

---

**18.** Taken together, these cases stand for the proposition that a defendant in a capital case has the right to present any relevant and competent mitigating evidence to the sentencer. *Lockett* was the foundation of this line of cases and established a bright-line rule: "the sentencer, in all but the rarest kind of capital case, [can]not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964-65. The two later cases merely refined the *Lockett* principles, making it clear that evidence of good behavior while incarcerated awaiting trial, *Skipper*, 476 U.S. at 4, 106 S.Ct. at 1671, and evidence of family history and emotional disturbance, *Eddings*, 455 U.S. at 113-116, 102 S.Ct. at 876-77, could not be excluded from capital sentencing hearings.

**19.** Fla.Stat.Ann. § 921.141(6) (West 1985) provides that:

> Mitigating circumstances shall be the following:
> (a) The defendant has no significant history of prior criminal activity.
> (b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (c) The victim was a participant in the defendant's conduct or consented to the act.
> (d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

> (e) The defendant acted under extreme duress or under the substantial domination of another person.
> (f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
> (g) The age of the defendant at the time of the crime.

**20.** Bolender was not barred from raising these claims in the state collateral proceedings since the Supreme Court's ruling in *Hitchcock* represents a sufficient change of law so as to defeat the application of a procedural bar. *Thompson v. Dugger*, 515 So.2d 173, 175 (Fla.1987), *cert. denied*, 485 U.S. 960, 108 S.Ct. 1224, 99 L.Ed.2d 424 (1988). Accordingly, the Florida courts considered these allegations on the merits. *See Bolender III*, 564 So.2d at 1058.

**21.** The more standard *Hitchcock* claim would have been that the instruction given in this case limited the jury's consideration of mitigating circumstances to those specified in the statute. In several cases, we have found *Hitchcock* violations where the trial court's jury instructions were almost identical to those given in *Hitchcock*. *See, e.g., Jackson v. Dugger*, 931 F.2d 712, 716 (11th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991); *Aldridge v. Dugger*, 925 F.2d 1320, 1328-29 (11th Cir.1991); *Hargrave*, 832 F.2d at 1534. The instruction on mitigation given in the instant case was substantially the same as the charge given in *Hitchcock*. Any such error was rendered harmless in this case, however, when the advisory jury returned a recommendation of life imprisonment.

and *Hitchcock* for two reasons. First, he argues, trial counsel was confused about the state of the law at the time of trial. And second, Bolender urges, the restrictive nature of the jury instruction the judge gave affected (and even controlled) the lawyer's decision not to develop nonstatutory mitigating evidence.[22] This court has previously indicated (but has not explicitly decided) that a habeas petitioner in a capital case is entitled to relief under *Lockett* and its progeny if a sentencer is limited in its consideration of mitigating evidence *or* if perceived constraints affected defense counsel's understanding or efforts. *See Booker v. Dugger*, 922 F.2d 633, 636 n. 3 (11th Cir.) (suggesting that, "[i]n addition to the evidence that was presented but was not considered, evidence existed that could have been submitted at the sentencing phase if counsel had not believed that the law limited him to statutory mitigating circumstances"), *cert. denied*, — U.S. —, 112 S.Ct. 277, 116 L.Ed.2d 228 (1991); *Knight v. Dugger*, 863 F.2d 705, 709 (11th Cir.1988) (Clark, J., concurring) (same conclusion).

■ Initially, we reject Bolender's argument that confusion in the Florida law hampered his attorney's efforts. The Supreme Court had already decided *Lockett* by the time of trial in this case. In addition, the Supreme Court of Florida had conformed state law to Supreme Court precedent in *Songer v. State*, 365 So.2d 696, 700 (Fla.1978) (per curiam), *cert. denied*, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979), in which it held that Florida's death penalty law did not, and had never, required that the trial courts exclude nonstatutory mitigating evidence. Instead, as the court explained in

that case, the "construction of Section 921.-141(6) has been that all relevant circumstances may be considered in mitigation, and that the factors listed in the statute merely indicate the principal factors to be considered." *Id.* Thus, the Florida Supreme Court held that section 921.141(6), as interpreted, satisfied the constitutional mandates enunciated in *Lockett.*

This court has acknowledged the confusion in Florida law surrounding nonstatutory mitigating evidence in capital sentencing that existed in the 1970s, but we have also recognized that the problem was cured in 1978:

> In summary, for six years after the Florida death penalty statute was reenacted in 1972, there was some ambiguity as to whether a defendant had a right to introduce evidence in mitigation at a capital sentencing proceeding when the evidence fell outside the mitigating factors enumerated in the statute.... The confusion was finally alleviated in *Songer v. State*, ... after the United States Supreme Court had ruled in *Lockett v. Ohio* ... that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record."

*Hitchcock v. Wainwright*, 770 F.2d 1514, 1516 (11th Cir.1985) (en banc), *rev'd on other grounds sub nom., Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

The trial and sentencing in this case took place in 1980, well after the decisions in *Lockett* and *Songer.*[23] Thus, we should pre-

---

**22.** Bolender's contentions in support of this claim blur into his arguments for ineffective assistance of counsel, discussed *supra*, part II. We conclude in this section that trial counsel was not constrained from developing and presenting nonstatutory mitigating evidence because of the restrictive jury instructions and law then in place. In reaching this conclusion, we find it significant that trial counsel in fact investigated background evidence in mitigation but decided against presenting it as a matter of strategy.

**23.** The cases upon which Bolender relies in arguing the allegedly preclusive effect of Florida law on defense counsel are inapposite because the death sentences in question in those cases were

imposed prior to the landmark 1978 decisions in *Lockett* and *Songer. See, e.g., Booker*, 922 F.2d at 634 (adopting state court findings of fact, *Booker v. State*, 397 So.2d 910 (Fla.1981), and noting that sentencing occurred in 1978 prior to *Songer*); *Aldridge*, 925 F.2d at 1322 (trial and sentencing in 1975); *Knight*, 863 F.2d at 759 (Clark, J., concurring) (noting that "[b]ecause of the state of the law in Florida at the time of Knight's trial, defense attorneys could not anticipate the conflict between the not yet decided *Lockett* decision and Florida's law limiting a jury's consideration of nonstatutory mitigating evidence"); *Cooper*, 807 F.2d at 882–83 (1974 sentencing proceeding). The relevant point in time for this

sume that counsel was aware of the prevailing law. Such a presumption is unnecessary, however, because the record in this case adequately demonstrates that defense counsel was aware of *Lockett* and *Songer* at the time of sentencing and, more importantly, that he understood the implications of those decisions. In a pretrial motion, defense counsel cited both cases in arguing that the mitigating circumstances provision of the Florida death penalty statute, Fla.Stat.Ann. § 921.141, was unconstitutional on its face, "violative of the mandate of the United States Supreme Court as expressed in *Lockett v. Ohio*, ... which requires that the defendant be allowed to present *all* evidence relevant to the mitigation of sentence." Although the trial court denied the motion, it is apparent that there was no confusion at the time of sentencing as to the constitutionality of Florida's law (as construed by the state supreme court) and that both the court and

defense counsel fully understood the implications of *Lockett* and *Songer*.

■ Bolender's second contention is that trial counsel felt constrained in developing and presenting mitigating evidence at the penalty phase of Bolender's trial *as a result of* the denial of his pretrial motion. Once the motion was denied, and once the court indicated at the charge conference for the penalty phase that it intended to use the standard instructions relating to aggravating and mitigating circumstances, Bolender argues, trial counsel's efforts were inhibited by what evidence he thought the trial judge would allow to be introduced (regardless of his understanding of the governing law).[24] But the trial court's ruling did not indicate in any way that counsel would be prevented from presenting any mitigating evidence that he wished. In fact, the ruling was consistent with prevailing law—which endorsed the introduction of all relevant information in mitigation. The court made an open invitation

---

inquiry is the time of sentencing, not the time of the federal appellate decision on habeas review.

**24.** The instruction given in the instant case was substantially the same as the charge that the Supreme Court rejected in *Hitchcock*. The Court in *Hitchcock* held that the record reflected a *Lockett* violation because:

> [T]he members of the jury were told by the trial judge that he would instruct them "on the factors in aggravation and mitigation that you may consider under our law." He then instructed them that "[t]he mitigating circumstances that you may consider shall be the following ..." (listing the statutory mitigating circumstances).

481 U.S. at 398, 107 S.Ct. at 1824 (citations omitted). At the beginning of the penalty phase of Bolender's trial, the court instructed the jury that "[a]t the conclusion of the taking of the evidence and after arguments of counsel, you will be instructed on the factors in aggravation and mitigation that you may consider." Then, after closing arguments for the penalty phase, the trial court gave the following instructions:

> The aggravating circumstances which you may consider are limited to such of the following as may be established by the evidence: [listing statutory aggravating circumstances].

> Should you find sufficient of these aggravating circumstances to exist, it will then be your duty to determine whether or not sufficient mitigating circumstances exist to outweigh the aggravating circumstances found to exist.

> The mitigating circumstances which you may consider, if established by the evidence,

are these: [listing statutory mitigating circumstances].

> If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence which should be imposed.

These instructions are also identical to those given in *Aldridge;* in that case, the court concluded that "[t]his instruction limited the jury to consideration of the statutory mitigating circumstances." 925 F.2d at 1329. In charging the jury in this case, therefore, the trial court arguably violated the command of *Lockett* and its progeny by suggesting that the only mitigating factors the jury should consider were those enumerated in the Florida death penalty statute.

However, "*Hitchcock* did not create a per se rule of reversal when the trial judge gives a particular instruction. Instead, the Court focused on the specific facts of the sentencing proceeding and emphasized that both the judge and the jury believed themselves to be limited to statutory mitigating factors." *Elledge*, 823 F.2d at 1448–49. In this case, the impressions of the judge and Bolender's counsel are relevant; the record reveals that neither believed themselves to be so limited. Moreover, *Hitchcock* had not yet been decided at the time of Bolender's trial. Consequently, we do not accept Bolender's argument that the mere similarity in the instructions can be used as evidence of constraints on his lawyer.

for both sides to present evidence at the penalty phase, and both sides declined.

■ In addition, as the preceding discussion on the ineffective assistance of counsel claim demonstrates, Bolender's trial counsel was not in fact constrained in developing and introducing nonstatutory mitigating evidence at the sentencing proceeding by the trial court's position.[25] At the state evidentiary hearing on the ineffective assistance issue, trial counsel testified that he had investigated nonstatutory mitigating evidence involving Bolender's background, but that he made a strategic decision not to present such testimony after observing the jurors and concluding that a quick recommendation of life from the jury would be more influential on the sentencing judge.[26] Significantly, he testified that he was aware that he could have presented such evidence:

> Q: Did you realize ... that mitigating circumstances are not limited to the factors set out in the statute?

A: Yes, Your Honor, I understand that they are not limited to what is set out in the statute.

> Q: Are you familiar with some of the Florida case law that says it is proper for juries in determining whether to recommend life or death to hear testimony about whether or not the defendant was a good husband, a good father, a good person?

A: Yes. That would go towards his humanity. I was aware that I could put on that type of testimony.

> Q: And you knew that the mother and the sister could testify to that, did you not?

A: Yes, I did.

Furthermore, the defense's entire argument at the penalty phase was based upon a form of nonstatutory mitigating evidence, namely the disparate treatment of codefendant Macker.[27] As the Florida Supreme Court

---

25. In support of his contention to the contrary, Bolender relies almost entirely upon a 1990 affidavit from trial counsel stating that, in his view, "[t]he mitigating factors seemed to be limited to the ones listed in the statute, and so it did not seem that there was much mitigating evidence available to me that was relevant." The affidavit is merely conclusory, however, and it does not explain his argument at trial or his testimony at the state court evidentiary hearing.

Our independent review of the record reveals that trial counsel in fact investigated nonstatutory background evidence but, instead of introducing it, elected to argue other nonstatutory mitigating circumstances (namely, disparate treatment among codefendants) as a matter of strategy. As the district court concluded, "the record clearly refutes Bolender's allegation that his defense counsel was precluded from presenting nonstatutory mitigating factors." *Bolender*, 757 F.Supp. at 1407. Given that state court findings of fact on this issue are entitled to a presumption of correctness, we cannot conclude that the district court's finding was clearly erroneous. The affidavit is too conclusory to lead us to question that finding.

26. Although this hearing did not directly concern the *Hitchcock* claim (which had not yet been asserted by Bolender), it did address the crucial issues of what mitigating evidence trial counsel had been aware of and why he decided against introducing it. While "[t]he mere occurrence of a full and fair hearing in the state court ... does not neutralize petitioner's right to an evidentiary hearing in federal court," *Meeks*, 963 F.2d at 319, this hearing was sufficient to resolve the factual issues underlying Bolender's *Hitchcock* claims.

27. Normally, mitigating circumstances are factors which go to the character of the individual defendant. Under Florida law, however, the disparate treatment of a codefendant can constitute a nonstatutory mitigating circumstance in cases where the defendants are equally culpable. *See, e.g., Parker v. Dugger*, 498 U.S. 308, 315, 111 S.Ct. 731, 736, 112 L.Ed.2d 812 (1991); *White v. Dugger*, 523 So.2d 140 (Fla.1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 153 (1988). Defense counsel's penalty phase argument to the jury and pre-sentencing argument to the judge can both be read as making this argument. Counsel argued as follows before the advisory jury:

> I do not think that you can in any kind of logical order go back and say that the State can say on the one hand, "We are going to reduce the charges from first to second degree [for Macker]," without actually really knowing what occurred, and, on the other hand, tell you and stand before you and say that Bolender should be electrocuted for the same charges.
> If there is any one consideration you consider, it is exactly what I have told you today, and I think you will see, as I did, because nobody knows what went on and nobody knows who shot and killed and stabbed whom except what Macker told you.

Following the jury's recommendation of life, Bolender's attorney then made a brief argument to the judge:

> Your Honor, the only thing I would like to say is that because of the nature of the circum-

concluded on direct appeal, "[t]he state's deal with Macker was argued as mitigation." *Bolender I,* 422 So.2d at 838 n. 6. We agree with the district court that "the record clearly refutes Bolender's allegation that his defense counsel was precluded from presenting nonstatutory mitigating factors," either explicitly or implicitly. *Bolender,* 757 F.Supp. at 1407. The decision not to introduce the background evidence was the product of strategy, not of constraints resulting from a limiting jury instruction or confusion in Florida's capital punishment jurisprudence.

### B.

■ In several cases, this court has found *Hitchcock* errors where the trial judge did not consider nonstatutory mitigating circumstances in sentencing a capital defendant. *See, e.g., Jackson v. Dugger,* 931 F.2d 712, 716 (11th Cir.1991). Bolender contends that the sentencing judge in this case similarly considered only the mitigating factors enumerated in the Florida death penalty statute. We conclude, however, that the state courts and the district court below properly denied this claim on its merits because the record reflects that, in this case, the trial court did not limit its consideration of nonstatutory mitigating evidence in any way.

Bolender's contention is belied by the plain terms of the trial court's sentencing order. After discussing each statutory aggravating and mitigating circumstance in turn, the court concluded:

> There has been no evidence or matters brought to the attention of this Court *in addition to those [statutory] mitigating factors enumerated above* which would in any way influence the Court in making a different conclusion of fact or in making its decision as to the sentence of this case.

> Upon careful consideration, at the time of the sentencing and during the formulation of the written Order, the inescapable conclusion of the Court is that sufficient Aggravating Circumstances exist and that *no Mitigating Circumstances exist* which

> could possibly outweigh the Aggravating Circumstances.

(Emphasis added). The court's order echoes its comments made at the time Bolender's sentence was orally pronounced:

> I have reviewed the aggravating circumstances in this case and find sufficient of them to warrant a consideration as to whether or not there are any mitigating circumstances, and I, for the life of me, cannot find a single mitigating circumstance on Mr. Bolender's behalf that would cause me to but otherwise overrule that decision, the recommendation made by the jury in this case.

Despite Bolender's contention, therefore, the court did not limit its consideration of mitigating factors to those outlined in the death penalty statute. In fact, it considered all of the evidence presented.

This case is therefore easily distinguished from those cases in which we have found a *Hitchcock* violation for failure of the trial judge to consider nonstatutory mitigating circumstances in fashioning an appropriate sentence. In *Jackson,* for example, the sentencing order was almost identical to that at issue in *Hitchcock,* referring explicitly to "insufficient mitigating circumstances as enumerated in Subsection (7) of ... Section 921.141" and not to other mitigating factors. 931 F.2d at 716. Bolender's sentencing proceeding was not infected with this error. Accordingly, we conclude that Bolender has failed to demonstrate a violation of the principles of *Lockett* and its progeny in this case.

### C.

■ Even were we able to locate an arguable *Hitchcock* violation in the record, we would nevertheless affirm the district court's denial of relief under the harmless error doctrine. Because the Supreme Court has recently decided that different harmless error standards are appropriate for direct and collateral review of state court convictions and sentences, we discuss this issue briefly.

stances under which the murders occurred, I do not believe that it is at all clear which individual perpetrated or actually was most

culpable for any of the crimes. I would say that based on that fact, it should act or inure to Mr. Bolender's benefit.

The prevailing standard for applying the harmless error doctrine evolved from *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which came before the Court on direct review. Applying *Chapman*, we have stated that "[a] *Hitchcock* violation is harmless error if the court can conclude beyond a reasonable doubt that the nonstatutory mitigating evidence regarding the defendant's character that was not considered by the jury would not have influenced the jury to recommend a life sentence." *Jackson*, 931 F.2d at 716. Nonstatutory mitigating evidence not considered by the jury "affects the jury's recommendation if it amounts to a significant mitigating circumstance." *Id.* See also *Tafero*, 873 F.2d at 252 n. 5 (discussing views in this circuit on the application of a harmless error standard for *Hitchcock* violations).

▮ Recently, however, the Supreme Court has held that "[t]he imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error." *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). The test the Court enunciated, which derives from *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is "whether the error 'had substantial and injurious effect or influence in determining the jury's [or the court's] verdict.'" *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1523). The Court explicitly held that, in order to satisfy this test, a habeas petitioner alleging constitutional trial errors is not entitled to habeas relief unless he or she can establish actual prejudice. *Id.* *Brecht* concerned an allegation that the prosecution's use of petitioner's post-*Miranda* silence for impeachment purposes violated *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), but the Court directed that the *Kotteakos* harmless error standard applies in all cases alleging constitutional errors of the "trial type." *Id.* Violations of *Lockett* and *Hitchcock* fall into this category. *See Arizona v. Fulminante*, 499 U.S. 279, 280, 111 S.Ct. 1246, 1249, 113 L.Ed.2d 302 (1991) (defining trial error as that which "occur[s] during the presentation of the case" in court).

Given the facts of this case, and the balance of aggravating and mitigating circumstances established, Bolender has failed to satisfy the *Brecht* standard. For the foregoing alternative reasons, therefore, we affirm the district court's disposition of Bolender's *Hitchcock* claims.

## IV.

Bolender also challenges several aspects of the Florida Supreme Court's review of his death sentence, focusing on the alleged improper use, doubling, and weighing of aggravating circumstances in sustaining the trial court's override of the advisory jury's life recommendation. In particular, Bolender contends that the Florida Supreme Court erred in failing to remand for resentencing after striking two aggravating circumstances relied upon by the trial court, in failing to apply limiting constructions to certain broadly worded aggravating circumstances, and in affirming three pairs of aggravating factors that were predicated upon identical underlying facts. Running through all of these arguments is a contention, raised more specifically below but also, we find, implicitly here, that the override of the jury's life recommendation was improper because that recommendation had a reasonable basis.

### A.

▮ Initially, Bolender contends that the Florida Supreme Court's review of the death sentences in this case violated *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), because the court failed to apply a constitutional standard of harmless error review when it declined to remand for resentencing after striking two of the aggravating circumstances found by the trial court. Instead, the state appellate court held that the invalidation of two aggravating circumstances did not require reversal of the death sentence in view of the remaining aggravating factors and the lack of mitigation. *See Bolender I*, 422 So.2d at 838.

In *Clemons*, the Court held that a state appellate court may constitutionally uphold a death sentence that is based in part on an invalid or improperly defined aggravating circumstance, provided that the decision is reached "either by reweighing of the aggravating and mitigating evidence or by harmless error review." 494 U.S. at 741, 110 S.Ct. at 1444. *Clemons* "stands for the proposition that state appellate courts in weighing states may independently weigh aggravating and mitigating circumstances and thereby cure certain errors that might have occurred at the sentencing phase of a trial; they may act as sentencers." [28] *Booker*, 922 F.2d at 642 (Tjoflat, C.J., specially concurring).

On several occasions, the Florida Supreme Court has stated that it does not reweigh evidence when reviewing a death sentence. *See, e.g., Hudson v. State*, 538 So.2d 829, 831 (Fla.) ("It is not within this Court's province to reweigh or reevaluate the evidence presented as to aggravating or mitigating circumstances."), *cert. denied*, 493 U.S. 875, 110 S.Ct. 212, 107 L.Ed.2d 165 (1989). The Florida Supreme Court does, however, conduct a proportionality review of the sentence, which "involves comparing the balance between aggravating and mitigating circumstances in the case at hand with the balance in other cases (not considered by the jury in recommending, or the trial judge in fashioning, the sentence to be given) in which the death penalty has been imposed." *Booker*, 922 F.2d at 643 (Tjoflat, C.J., specially concurring). To the United States Supreme Court, and despite the Florida Supreme Court's protestations to the contrary, this form of analysis may constitute exactly the type of "reweighing" referred to in *Clemons*. *See Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (per curiam); *Booker*, 922 F.2d at 642–43 (Tjoflat, C.J., specially concurring). To cure a constitutional violation in the trial court under *Clemons*, therefore, an appellate court in a weighing state need only reconsider the balance of aggravating and mitigating circumstances to

determine whether the evidence still justifies the death penalty.

Two years after *Clemons*, the Supreme Court gave its holding further form in a Florida capital case, *Sochor v. Florida*, —— U.S. ——, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). In *Sochor*, the Court held that the Florida Supreme Court's consideration of a death sentence did not cure the trial court's erroneous consideration of an aggravating factor since the appellate court "did not explain or even 'declare a belief that' this error 'was harmless beyond a reasonable doubt' in that 'it did not contribute to the [sentence] obtained.'" *Id.* at ——, 112 S.Ct. at 2123 (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). The Court noted that "the Supreme Court of Florida will generally not reweigh evidence independently," *id.* at ——, 112 S.Ct. at 2122, and concluded that it had not done so in the instant case. Because it could find no indication that the state court had conducted an appropriate harmless error analysis, *id.* at ——, 112 S.Ct. at 2123, the Court held that *Clemons* had not been satisfied. The Court stressed that it did "not mean here to require a particular formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny," but nevertheless demanded more than mere "allusions by citation." *Id.*

In this case, the Florida Supreme Court conducted the type of reweighing called for in *Clemons* and *Sochor* after striking the two aggravating circumstances. As in *Sochor*, the Florida Supreme Court did not state that it had reviewed Bolender's case for harmless error. But the opinion in Bolender's case on direct appeal, unlike the decision in *Sochor*, does indicate that the Florida Supreme Court reweighed the aggravating and mitigating circumstances in the manner contemplated by *Clemons*. First, the court determined that "[t]he disparity between Bolender's death sentences and Macker's twelve concurrent life sentences is supported by the facts." *Bolender I*, 422 So.2d at 837. Having evaluated the only aspect of the case that was argued as mitigation, the court then found that, "[b]ased on the evidence and testimony at trial, we agree with the trial court that virtually no reasonable person

---

28. Florida is a "weighing" state because a death sentence may be imposed only when the aggravating circumstances outweigh the mitigating circumstances. *See* Fla.Stat.Ann. § 921.141(2)–(3) (West 1985).

could differ on the sentence." *Id.* Finally, the court concluded by comparing the aggravating and mitigating circumstances proved and finding that, on the record before the court, "[i]n the absence of any mitigating circumstance disapproval of two aggravating factors does not require reversal of the death sentence." *Id.* at 838. Accordingly, the Florida Supreme Court conducted the proper form of review after it invalidated the use of two aggravating circumstances and concluded that the balance of the aggravating and mitigating factors clearly justified the imposition of the death penalty; it did not err in declining to remand the case for resentencing.

### B.

Since *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court has required that a capital sentencer's discretion be channeled and limited so as to minimize the risk of wholly arbitrary and capricious decisions. *See Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2940–41, 49 L.Ed.2d 859 (1976) (plurality opinion). In particular, the Court has held that an overbroad application of a statutory aggravating circumstance is invalid where there is "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980) (invalidating provision allowing death penalty when crime was "outrageously or wantonly vile, horrible and inhuman" because nothing in those words, standing alone, "implies any

inherent restraint on the arbitrary and capricious infliction of the death sentence"). Accordingly, aggravating circumstances, as construed and applied by the state courts, "must genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

Bolender suggests that both the Florida Supreme Court and the original sentencing court failed to apply limiting constructions to the broadly worded aggravating circumstances used to justify imposition of the death penalty in this case. The Florida Supreme Court held Bolender's claims regarding two of the aggravating factors to be procedurally barred;[29] we have reviewed the application of the remaining aggravating circumstances challenged on appeal and conclude that their use did not violate the Constitution.

In overriding the jury's recommendation of life imprisonment, the trial court found the existence of the aggravating factors involving avoiding arrest and hindering law enforcement.[30] The Florida Supreme Court has applied these aggravating factors primarily in situations where the defendant kills a law enforcement officer in an attempt to avoid arrest, but they also may be applicable "when the factfinder determines that the dominant motive of the murder was for the elimination of witnesses." *Herzog v. State,* 439 So.2d 1372, 1379 (Fla.1983); *Riley v. State,* 366 So.2d 19 (Fla.1978). Furthermore, "[w]e have no reason to doubt that the sentencing judge, 'who is presumed to know and

---

**29.** Bolender contends that the Florida statutory aggravating factors of "cold, calculated and premeditated" and "heinous, atrocious and cruel" were applied to him in an unconstitutionally broad manner in violation of *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Bolender raised these issues for the first time in his second Rule 3.850 motion for postconviction relief, however, and the Florida Supreme Court held them to be procedurally barred because they were untimely and should have been raised in earlier proceedings. *Bolender III,* 564 So.2d at 1058 n. 1, 1059. The procedural bar was valid, so the state court disposition of these claims rested upon an independent and adequate state law ground. *Sochor,* —— U.S. at ——, 112 S.Ct. at 2120. We are therefore

without authority to address Bolender's claims concerning these two aggravating circumstances.

**30.** The Florida death penalty statute provides, in relevant part, as follows:

Aggravating circumstances shall be limited to the following:

. . .

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

. . .

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Fla.Stat.Ann. § 921.141(5) (West 1985 & Supp. 1993).

apply the appropriate, narrow construction' of the aggravating circumstance, was guided by the Florida appellate construction of the words" of these aggravating factors. *Bertolotti v. Dugger*, 883 F.2d 1503, 1527 (11th Cir.1989) (quoting *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 n. 5 (11th Cir.1989)), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

On direct appeal, the Florida Supreme Court determined that the trial court had properly applied these factors:

> The crimes ... were committed for the purpose of avoiding or preventing a lawful arrest and to disrupt or hinder the lawful exercise of law enforcement. John Merino was described as a police informant and was still alive when the defendants attempted to burn the vehicle. After committing the robbery, kidnapping and torture, the defendants murdered the victims partially to prevent their retaliation but also to prevent arrest.

*Bolender I*, 422 So.2d at 838. Thus, there is ample record evidence to support each of the aggravating circumstances found.[31] It appears that the state courts applied an acceptable limiting construction on these aggravating circumstances, and it is not this court's function to second-guess its application by re-evaluating the evidence. Regardless of what the Florida Supreme Court may have done in other cases, we find no error in its application of the aggravating circumstance in this case because the record reflects that Bolender's conduct falls within the range of activities for which its use is particularly appropriate.

### C.

■■■■ Bolender contends that the Florida Supreme Court failed to correct the trial judge's erroneous application of two aspects of state law: the prohibition against "doubling" aggravating circumstances and the standard governing a judge's decision to override the recommendation of an advisory jury. Under Florida law, a jury's recommen-

dation of a life sentence is entitled to great weight and may only be overturned by a sentencing judge when "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." *Tedder*, 322 So.2d at 910. The Florida Supreme Court has not hesitated to apply this exacting standard and to reverse the trial court's imposition of sentence when it believed that reasonable minds could, in fact, have differed on the appropriateness of the death penalty. *See, e.g., Spaziano v. Florida*, 468 U.S. 447, 466, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984); *Richardson*, 437 So.2d at 1095; *Welty v. State*, 402 So.2d 1159, 1164–65 (Fla.1981). The Florida Supreme Court has also held that the "doubling" of aggravating factors—the use of the same factual predicates to find two aggravating circumstances—is improper. *See Provence v. State*, 337 So.2d 783, 786 (Fla.1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). The use of aggravating circumstances can be upheld even when the trial court considers both factors together, however, when the trial court's findings contain distinct proof as to each factor, *Hill v. State*, 422 So.2d 816, 818–19 (Fla.1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1262, 75 L.Ed.2d 488 (1983), or when the two factors were consolidated and given appropriate weight, *Jackson v. State*, 498 So.2d 406, 411 (Fla.1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987). *See also Francis*, 908 F.2d at 705 ("The Florida sentencing scheme is not founded on 'mere tabulation' of the aggravating and mitigating factors, but relies instead on the weight of the underlying facts.").

■■■■ Review of these issues by federal courts evaluating petitions for writs of habeas corpus from state prisoners is appropriately limited; federal courts do not sit to revisit a state supreme court's judgment as to whether the trial court complied with state law. It is axiomatic that, "to the extent that [death penalty] proceedings do not produce

---

**31.** *See, e.g., Provenzano v. State*, 497 So.2d 1177, 1183 (Fla.1986) (hindering law enforcement aggravating circumstance not improperly doubled with avoiding arrest factor because separate factual circumstances supported each finding), *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987); *Francis v. State*, 473 So.2d 672, 675–76 (Fla.1985) (hindering law enforcement aggravating factor appropriate where decedent was a confidential informant and defendant suggested that victim would have to die), *cert. denied*, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986).

an arbitrary or discriminatory result, the Constitution is not violated, and we will not second-guess the state courts on a matter of state law." *Lusk,* 890 F.2d at 342. Florida's override scheme has been upheld as constitutional precisely because the capital sentencing scheme "has struck a reasonable balance between sensitivity to the individual and his circumstances and ensuring that the penalty is not imposed arbitrarily or discriminatorily." *Spaziano,* 468 U.S. at 464, 104 S.Ct. at 3164; *see also Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). This court may not second-guess the state supreme court concerning whether the trial court complied with the mandates of *Tedder;* it is not our function to decide whether we agree with the advisory jury, on the one hand, or with the sentencing judge and the Florida Supreme Court, on the other. *Francis,* 908 F.2d at 704; *Lusk,* 890 F.2d at 342. Instead, our review is limited to a determination of "whether the state's application of the override scheme in this case resulted in the arbitrary or discriminatory imposition of the death penalty." *Francis,* 908 F.2d at 704. The same constraints govern our evaluation of the Florida Supreme Court's application of its own rules governing the support needed for aggravating circumstances.

In this case, nothing in the record suggests that the application of either the jury override procedure or the rules against "doubling" of aggravating factors has resulted in the arbitrary or discriminatory application of the death penalty. The trial court conducted the required independent review of the evidence, and it set forth its findings in support of the death penalty as required. On direct appeal, the Florida Supreme Court concluded that the trial court had complied with state law in both of the areas about which Bolender complains. *Bolender I,* 422 So.2d at 837–38. *See Lusk,* 890 F.2d at 342. Bolender is therefore not entitled to relief based upon these arguments, and the district court properly refused to issue the writ of habeas corpus on these grounds.

## V.

 In addition, Bolender argues that his constitutional rights were violated when the trial court refused to grant his motion for a writ of habeas corpus ad testificandum to secure the testimony of his codefendant, Paul Thompson. Under Florida law, the issuance of such a writ, which is used to bring an incarcerated prisoner to give evidence before the court, is in the discretion of the trial court. *Moody v. State,* 418 So.2d 989, 992 (Fla.1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1213, 75 L.Ed.2d 451 (1983). On direct appeal, the Florida Supreme Court found no abuse of discretion by the trial court in denying the writ, *Bolender I,* 422 So.2d at 836, and the district court below agreed, concluding that Bolender's Sixth Amendment right to compulsory process was not denied by that decision, *Bolender,* 757 F.Supp. at 1408. Our review of the record leads us to agree.

In most cases, the Florida Supreme Court has explained, the use of the writ of habeas corpus ad testificandum has been superseded by statute. *Bolender I,* 422 So.2d at 835. And "since habeas corpus is a highly prerogative writ, ... petitions for habeas corpus ad testificandum, as other petitions for writs of habeas corpus, should not be granted when the relief sought can be obtained through other legal processes." *Id.* The court found the following relevant facts on direct appeal:

> Section 914.001, Florida Statutes (1979), provides that witness subpoenas in criminal cases shall run throughout the state, and section 48.051, Florida Statutes (1979), specifically allows for service of process on state prisoners....
>
> In the instant case, Bolender served Thompson with a witness subpoena at the facility where Thompson was incarcerated. Thompson's attorney moved to quash the service on the grounds that Thompson had been adjudicated incompetent and a guardian had been appointed. Under section 48.041, Florida Statutes (1979), his guardian should have been served. The court reserved ruling on that motion, but Bolender never sought to serve the proper party or enforce the original subpoena.

*Id.* Later, during the presentation of his case, Bolender requested that the trial court issue a writ of habeas corpus ad testificandum to secure Thompson's presence as a witness. The court denied the motion, and the Florida Supreme Court approved that decision on appeal. It explained:

> Bolender was on notice from the [earlier] hearing that his original subpoena may

have been defective, yet he failed to correct the improper service or file for the writ prior to trial. By waiting until the state had rested before seeking the writ, Bolender improperly sought to disrupt and delay the proceedings, and the court properly denied his motion.

*Id.* at 836.

■■■ Bolender contends that the trial court's action in refusing to issue the writ deprived him of the right of compulsory process as guaranteed by the Sixth Amendment. The right of the accused to present witnesses in his own defense is fundamental to the fairness of the adversary system. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). However, the decision whether to employ the right to compulsory process in a given case rests with the defendant, and "[t]he very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 653–54, 98 L.Ed.2d 798 (1988). The Supreme Court has concluded that "[i]t would demean the high purpose of the Compulsory Process Clause" to construe it to exempt defendants from "adherence to rules of procedure that govern the orderly presentation of facts and arguments" in the adversary process. *Id.* at 416, 411, 108 S.Ct. at 656, 654 (holding that exclusion of defense witness does not violate Sixth Amendment where defendant failed to comply with discovery rule requiring that witnesses be identified before trial). Defendants may constitutionally be required to comply with procedural rules governing subpoenas and other trial functions, the Court said, because "[l]awyers are accustomed to meeting deadlines" and "[r]outine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial." *Id.* at 415–16, 108 S.Ct. at 656.

In this case, there was nothing constitutionally deficient in the district court's refusal to issue a writ of habeas corpus ad testificandum to secure Thompson's testimony. Despite notice, Bolender failed to satisfy the state procedural rules for service of a subpoena. Moreover his petition was untimely, coming as it did after the state had rested its case. *Cf. United States v. Rinchack*, 820 F.2d 1557, 1568 (11th Cir.1987) (holding that "a district court may refuse to issue a writ of habeas corpus *ad testificandum* solely on the grounds that the petition is untimely" when the request was not filed until the trial actually began). In addition to the untimeliness of the request, the trial court properly could have denied the petition for the presence of Thompson because of the questionable value of his testimony. Thompson had been adjudicated incompetent to stand trial. While the standard for competency to testify is more lenient than that for competency to stand trial, there is doubt as to whether he could have satisfied either. Furthermore, as the Florida Supreme Court found, "[a]t the hearing Thompson's attorney also informed the court that his client would invoke his right to remain silent if called at trial" and found to be competent. *Bolender I*, 422 So.2d at 835. Accordingly, the denial of the petition does not constitute a constitutional violation entitling Bolender to habeas corpus relief.

## VI.

■■■ Finally, we turn to Bolender's claim that the trial court's instructions at the guilt phase impermissibly directed a verdict for the state in violation of the Due Process Clause of the Fourteenth Amendment, and that appellate counsel rendered ineffective assistance in failing to litigate this issue on direct appeal. Bolender's objection stems from the fact that the court began its instructions by telling the jury the following:

These crimes are alleged to have occurred here in Dade County, Florida, between the 7th and 10th of January, 1980.

There is no argument in this case but that a homicide did take place on that date or those dates and that it occurred in Dade County.

Obviously the balance of the issues are for your determination.

Bolender contends that these sentences directed a verdict for the State on elements of the offense and therefore violated the principles enunciated by *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), in which the Court held that due process requires proof beyond a reasonable doubt of every fact necessary to constitute the crime charged.

Both the Florida Supreme Court and the district court below concluded that these claims are meritless. We agree. Contrary to Bolender's contention, these few sentences from the court's instructions did not tell the jury that it had to find that Bolender was guilty of the murders. The defense had conceded that four men were tortured and murdered at the hands of another human being. As the Florida Supreme Court concluded when it considered these claims, "[t]he state established corpus delicti in this case, the quoted statement merely recited the obvious, and the instructions did not direct a verdict for the state." *Bolender III,* 564 So.2d at 1059.[32] The court was merely pointing out that these limited points were not contested while stressing that *everything else* fell within the jury's province. Moreover, the jury did not hear only the challenged sentences, and "the potentially offending words must be considered in the context of the charge as a whole." *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). The court explained shortly thereafter that "[t]he killing of one human being by another is called homicide" and that such a killing could be either lawful or unlawful. In explaining these concepts, "[t]he Court neither expressed an opinion on the legality of the killing nor connected it to the defendant." *Bolender,* 757 F.Supp. at 1408.

▮ As for the claim that appellate counsel (a different lawyer from trial counsel) was ineffective for not raising this claim on direct appeal, we note that "raising every single frivolous point on appeal is not a sign of effective counsel and indeed 'often has the effect of diluting the import of stronger points.'" *Bolender,* 757 F.Supp. at 1409 (quoting *Atkins v. Dugger,* 541 So.2d 1165, 1167 (Fla.1989)). The Florida Supreme Court believed that "[i]f this issue had been raised on direct appeal, it would have been found meritless," *Bolender III,* 564 So.2d at 1059, and it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance. *See King v. Dug-*

*ger,* 555 So.2d 355, 359 (Fla.1990). Bolender has therefore failed to overcome the presumption, .discussed above, that appellate counsel's conduct falls within the wide range of reasonable professional assistance.

### VII.

For the foregoing reasons, we conclude that all of the claims raised by Bolender in this appeal relating to his convictions and death sentences are either procedurally barred or without merit. Accordingly, the judgment of the district court denying Bolender's petition for a writ of habeas corpus is

AFFIRMED.

**32.** These claims were presented for the first time in a petition to the Florida Supreme Court for a writ of habeas corpus that accompanied Bolender's appeal of the denial of his second Rule 3.850 petition. Noting that the court had "fully considered the propriety of Bolender's sentences on direct appeal" and that "[h]abeas corpus is not to be used to relitigate issues determined in a prior appeal," *Bolender III,* 564 So.2d at 1059, the court held that most of the claims raised were procedurally barred and considered only the directed verdict issues on the merits, *id.*